Filed 9/26/24  P. v. Roberts CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ANTONIO ROBERTS,<br><br>　　　Defendant and Appellant. | B328834<br><br>(Los Angeles County<br>Super. Ct. No. MA007808) |

　　　APPEAL from an order of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Affirmed.

　　　John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stephanie C. Brenan and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

In 1996, a jury convicted Antonio Roberts of special circumstance first degree murder and of second degree robbery. Years later, he petitioned for resentencing under Penal Code[1] section 1172.6, which limited accomplice liability for murder. The trial court denied the petition without holding an evidentiary hearing, finding that based on the jury's true finding on the special circumstance allegation, Roberts was convicted as either the actual killer or as a direct aider and abettor with the intent to kill. Roberts appeals, contending that the special circumstance finding does not render him ineligible for relief as a matter of law. We disagree and affirm the order.

## BACKGROUND

I.    The felony complaint and evidence at trial[2]

A felony complaint charged Roberts with the special circumstance murder of Sung Hee Hwang (§§ 187, subd. (a), 190.2, subd. (a)(17) [murder committed during robbery]; count 1) and with second degree robbery (§ 211; count 2). Two of Roberts's

---

[1]    All further statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

[2]    We grant Roberts's request for judicial notice of the appellate record in the case on direct appeal, *People v. Roberts* (July 1, 1998, B110600) [nonpub. opn.]. (Evid. Code, § 452, subd. (d); see *People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*) [appellate opinion generally part of record of conviction in § 1172.6 proceedings].) To the extent we rely on the opinion in Roberts's prior appeal, we do so solely for procedural facts. (§ 1172.6, subd. (d)(3).)

accomplices, Tyrran Wilson[3] and Walter Johnson, testified against him at trial. A third accomplice, Damian Hunter, did not testify. The following evidence was adduced at Roberts's trial.

A. *The robbery and murder*

On the afternoon of February 18, 1994, Maria Klupp was at Charlie's Jewelry Store. Hwang owned the jewelry store. While at the jewelry store, Klupp saw a Black man in the store and, five minutes later, she saw another Black man enter. One of the men had a "kind of wrench, like they use to open keys" in his pocket. Klupp went to another store in the strip mall, but she heard screams and somebody said the jewelry store was being robbed.

Around the time of the murder, Daniel Houfek was driving near Charlie's Jewelry Store. Houfek saw three Black men running to a car parked just north of the jewelry store. A fourth man was standing at the parked car. All four men got into the car and left. Houfek thought that one man might have had a gun.

Hwang was dead, having been shot three times, including once to the chest. Jewelry was missing.

Law enforcement recovered potato pieces and .22-caliber rifle shell casings from the jewelry store. Roberts's and Hunter's fingerprints were on glass display cases, and Roberts's fingerprint was on broken glass from a display case.[4]

---

[3]     Wilson is sometimes referred to as Burrell in the record.

[4]     According to Hwang's girlfriend, he cleaned the jewelry cases every night.

3

B. *Roberts's arrest and first statement about the crimes*

Roberts was arrested. While Roberts was in a holding cell, a deputy sheriff overheard him tell another inmate, " 'We did a 187.' " Roberts also said, " 'We went to a jewelry store' " and " 'The dude tried to take a ring.' " With his right hand, Roberts grabbed his left finger and pantomimed pulling something off a ring finger. Roberts waved his hand in a downward motion, started to walk away, and said, " 'We turned around.' " He walked to the center of the cell, pushed an imaginary person to the ground, and kicked down. After making the kicking motion, Roberts raised his hands to shoulder height, extended his right index finger, and said " 'pow.' " Roberts made eye contact with the deputy sheriff and told him he was wasting his time trying to get him for some other robbery and should instead check the robbery that occurred on 10th Street across from the police station.

Roberts then told a detective that the day before Hwang's murder, Roberts was at the jewelry store with his girlfriend to get a ring resized. While there, he saw Hwang "flossing money," meaning counting money. Roberts went home and told his friends Hunter and Johnson what he had seen. His friends planned to rob the jewelry store and to kill Hwang. Another friend, Wilson, taped a potato to the end of a .22-caliber rifle as a silencer. The next day, Roberts was at the jewelry store again with his girlfriend to get a ring resized when Johnson, Wilson, and Hunter entered. Roberts was leaving when he saw Wilson shoot Hwang with the rifle. Johnson, Wilson, and Hunter ran out

4

of the store and drove away in a grey Cutlass with a fourth man who Roberts identified as "Bridle."[5]

With Roberts's help, law enforcement recovered from his house and nearby areas .22-caliber shell casings, .22-live ammunition, other rifles and guns, and a potato with duct tape wrapped around it. Roberts said that the rifle used to kill Hwang had been broken into several pieces, the rifle stock burned, and the rifle pieces dispersed in the nearby area. He helped law enforcement recover those pieces. A grey Cutlass was parked at the house, and a potato was inside the car.

C. *Roberts's second statement about the crimes*

While Roberts was released from custody and helping law enforcement in their case against Johnson, Wilson, and Hunter, he told the detective that he was more involved in planning the robbery and murder than he had disclosed. He said that the initial plan was for him to have a car across the street from the jewelry store and to shoot Hwang with the rifle from across the street. But Wilson said he wanted to do it and took the rifle. Roberts, Wilson, and Hunter discussed putting a potato at the end of the rifle.

D. *Other witness testimony*

Roberts's girlfriend testified that on the evening Hwang was killed, she was at Roberts's house with him, Wilson, Johnson, and Hunter. The men were discussing Hwang's murder. Roberts told her that they went inside the jewelry store and saw an open safe. This gave them "the idea," and Wilson shot Hwang.

---

[5]     Law enforcement never identified or found "Bridle."

Other witnesses, however, testified that Roberts, not Wilson, was the shooter. Mishelle Burrell[6] testified that Roberts told her that he killed Hwang because Hwang was uncooperative. Roberts also told her that he had previously robbed Hwang, but that this time Hwang did not do what he was told and had a golf club in his hand.[7]

Accomplices Johnson and Wilson also testified that Roberts was the shooter. Both Johnson and Wilson had pleaded guilty to robbery and agreed to testify against Roberts. Johnson testified that it was Roberts's idea to rob the jewelry store while Hunter got his ears pierced. Johnson drove them to the jewelry store, and Roberts had a .22 rifle with a potato taped to it, which was also Roberts's idea. Roberts and Hunter went into the store, but only Roberts was armed. Johnson remained in the car. Wilson stood by the car. When Roberts and Hunter returned to the car, Roberts said Hwang would not give him money, so Roberts shot him. Back at Roberts's house, the men split money and jewelry from the store.

Wilson similarly testified that the plan was for Roberts and Hunter to rob the jewelry store while Wilson and Johnson acted as lookouts. Roberts had a .22 rifle with a potato taped to it. A few minutes after Roberts and Hunter went into the jewelry store, they ran back to the car and drove home. Wilson denied going into the jewelry store and shooting Hwang.

---

[6]     Accomplice Wilson is Burrell's brother.

[7]     In closing argument, the prosecutor referred to a photograph exhibit showing a golf club near Hwang's body.

II.    Verdict and sentence

A jury found Roberts guilty of count 1, first degree murder with a special circumstance finding that he committed the murder while engaged in a robbery, and of count 2, second degree robbery. As to both counts, the jury found that Roberts personally used a firearm, a rifle (§ 12022.5, subd. (a)). In 1996, the trial court sentenced Roberts on count 1 to life without parole for the murder, five years for the firearm enhancement, and one year for a prison prior (§ 667.5, subd. (b)). The trial court imposed but stayed the sentence on count 2.

A different panel of this division affirmed the judgment of conviction on direct appeal in *People v. Roberts*, *supra*, B110600.

III.    Section 1172.6 proceedings

In 2022, Roberts petitioned for resentencing under section 1172.6. The trial court appointed counsel for Roberts. The People opposed the petition on the ground that the jury was not instructed on the natural and probable consequences doctrine but was instructed with CALJIC No. 8.80.1, which required the jury to find that Roberts was the actual killer or intended to kill a human being to find the special circumstance true.

On March 6, 2023, the trial court denied the petition on the ground that the jury found Roberts to be the actual killer or intended to kill a human being when he committed the robbery.

## DISCUSSION

I.    Overview of Senate Bill No. 1437

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) limited accomplice liability

7

under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime.  (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *Lewis*, *supra*, 11 Cal.5th at pp. 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.)  Senate Bill No. 1437 added section 189, subdivision (e) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that "to be convicted of murder, a principal in a crime shall act with malice aforethought" and malice "shall not be imputed to a person based solely on his or her participation in a crime").  As amended by Senate Bill No. 775, effective January 1, 2022, these ameliorative changes to the law now expressly apply to attempted murder and voluntary manslaughter.

Senate Bill No. 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder, attempted murder, or voluntary manslaughter under the former law to be resentenced if the person could no longer be convicted of those crimes under the current law.  (*Lewis*, *supra*, 11 Cal.5th at p. 959; *People v. Gentile*, *supra*, 10 Cal.5th at p. 847.)  A petitioner commences that procedure by filing a petition containing a declaration that, among other things, the petitioner could not presently be convicted of murder, attempted murder, or voluntary manslaughter under the current law.  (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

At the prima facie stage, the trial court takes as true the petitioner's factual allegations and assesses whether the petitioner would be entitled to relief if those allegations were proven.  (*Lewis*, *supra*, 11 Cal.5th at p. 971.)  In determining

8

whether the petitioner has made a prima facie case for relief, the trial court may look at the record of conviction, including jury instructions, verdicts, and closing argument, to determine readily ascertainable facts such as the crime of conviction.  (*People v. Duchine* (2021) 60 Cal.App.5th 798, 815; see, e.g., *People v. Harden* (2022) 81 Cal.App.5th 45, 56.)  At the prima facie stage, the trial court does not engage in fact finding that involves the weighing of evidence or exercise of discretion.  (*Lewis*, at p. 972.)  If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing.  (§ 1172.6, subds. (b)(3), (c), & (d)(1).)  But if at the prima facie stage the record of conviction establishes that the petition is meritless, the trial court may dismiss it.  (*Lewis*, at p. 971.)

To deny a petition at the prima facie stage, the record of conviction must demonstrate the petitioner is ineligible for relief as a matter of law.  (*People v. Ervin* (2021) 72 Cal.App.5th 90, 101 (*Ervin*).)  We review the denial of a petition at the prima facie stage de novo.  (*Ibid.*)

II.     The record of conviction established Roberts's ineligibility for relief

Roberts contends that the trial court erred in finding that the special circumstance jury instruction, CALJIC No. 8.80.1, established he was convicted as the actual killer or a direct aider and abettor who had intent to kill, thereby rendering him ineligible for relief as a matter of law.  We disagree.

As to felony murder, Roberts's jury was instructed that an unlawful killing occurring during the commission or attempted commission of a robbery is first degree murder when the perpetrator had the specific intent to commit robbery.  (CALJIC

Nos. 8.21, 8.27.) The jury was further instructed on the special circumstance with CALJIC No. 8.80.1:

> If you find the defendant in this case guilty of murder of the first degree on the theory that the victim was killed during the commission of a robbery, you must then also determine if the special circumstance that the alleged victim was killed during the commission of a robbery is true or not true.
>
> The People have the burden of proving the truth of this alleged special circumstance. If you have a reasonable doubt as to whether this special circumstance is true, you must find it to be not true.
>
> If you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance true.
>
> However, if you find that the defendant was not the actual killer of a human being, or you are unable to decide whether the defendant was either the actual killer or an aider and abettor, you cannot find the special circumstance to be true unless you are satisfied beyond a reasonable doubt that the defendant, with the intent to kill, aided, abetted, or assisted any actor in the commission of the murder in the first degree.[8]

---

[8] During the jury instruction conference, the trial court said it intended to include a paragraph that the special circumstance could also be found true if the jury found that Roberts was a major participant who acted with reckless indifference to human life. The record does not show why the jury was not instructed on that theory.

10

CALJIC No. 8.80.1 thus permitted the jury to find the special circumstance true only if it found beyond a reasonable doubt either that (1) Roberts was the actual killer or (2) he aided and abetted, with intent to kill, a first degree murder. Roberts's jury found the special circumstance true; therefore, it believed either that he was the actual killer or a direct aider and abettor with malice/intent to kill. (See, e.g., *People v. Harden*, *supra*, 81 Cal.App.5th at p. 55, fn. 8 [true finding based on CALJIC No. 8.80.1 means defendant was either actual killer or had specific intent to kill].) Actual killers and direct aider and abettors who intend to kill are ineligible for section 1172.6 relief. (See *People v. Delgadillo* (2022) 14 Cal.5th 216, 233 [actual killer and sole participant in crime ineligible for § 1172.6 relief]; *People v. Curiel* (2023) 15 Cal.5th 433, 462 [after Sen. Bill No. 1437's enactment, murder "liability requires a different, valid theory, such as direct aiding and abetting"].)

In addition to the jury instruction, the record of conviction, namely, the jury's verdict and the People's closing arguments, further show that Roberts was convicted as the actual killer or a direct aider and abettor who had intent to kill. The jury found that Roberts personally used a firearm in the commission of the murder and robbery, under section 12022.5, subdivision (a). Although the jury was instructed that "personally used a firearm" had three meanings—Roberts (1) intentionally displayed a firearm in a menacing manner, (2) intentionally fired it, or (3) intentionally struck or hit a human being with it (CALJIC No. 17.19)—the prosecutor argued only that Roberts "personally pulled the trigger" and did not argue that Roberts used the gun in any of the other ways. Indeed, there was no theory posited by any party or evidence produced that Roberts displayed the rifle in

11

a menacing manner or hit Hwang with it. The only evidence relevant to the firearm enhancement was that Roberts was the shooter, i.e., he personally pulled the trigger. The jury's true finding on the firearm enhancement was consistent with—albeit not conclusive of—a conclusion that Roberts intentionally fired the rifle.

The prosecutor's closing argument advanced its theory that Roberts was the actual killer. In making that argument, the prosecutor focused on the evidence supporting that theory rather than the instructions. And when the prosecutor referred to the instructions, he merely said that if the jury did not believe Roberts actually killed Hwang, Roberts was still guilty as an aider and abettor, "and he had to intend to kill by supplying a silenced weapon. He tells us he did that—he's also guilty of the special circumstance." Defense counsel then reiterated in his closing argument that an aider and abettor must intend to kill, saying that to "find the special circumstance true, you must find that Mr. Roberts was the actual killer or that [he w]as a participant and he had the intent to kill Mr. Hwang."

A brief comment the prosecutor made in rebuttal did not tell the jury to disregard intent to kill if it believed Roberts was an aider and abettor and not the actual killer. The prosecutor said, "Look at the law as it applies to first degree murder. You heard it this morning. Any death during the course of a robbery is murder in the first degree. Look at the special circumstance, once a first degree murder has been proven. *If the killing occurred in the commission of the robbery, the special circumstance is true*." (Italics added.) The prosecutor then immediately added that if the jury believed Wilson was the shooter despite the only evidence for that notion being Roberts's

12

uncorroborated statements, Roberts was "still involved in the planning and the preparation for the robbery, and he still had the intent to kill" Hwang. Placed in the specific context of what the prosecutor said and the general context of closing arguments as a whole, at no time did the prosecutor tell the jury it could find the special circumstance true if Roberts was an aider and abettor and *lacked* intent to kill Hwang. Instead, both the prosecutor and defense counsel repeatedly said that an aider and abettor must intend to kill.

Roberts nonetheless contends CALJIC No. 8.80.1 allowed the jury to find the special circumstance true even if it believed Roberts was an aider and abettor who "abandoned" any intent to kill once Wilson said he wanted to be the shooter. We disagree because CALJIC No. 8.80.1 specifically required the jury to find that Roberts "with the intent to kill, aided, abetted, or assisted any actor in the commission of the murder in the first degree." Meaning, if the jury convicted defendant on an aiding and abetting theory, the jury necessarily found he had the intent to kill when he did the aiding and abetting. That a defendant could change his mind after he completed the aiding and abetting is of no consequence. There was no ambiguity as to Roberts's intent.

Roberts cursorily cites *Ervin*, *supra*, 72 Cal.App.5th 90, for support. *Ervin*, however, did not address an "abandonment of intent" theory. Rather, in *Ervin*, the defendant Ervin and two accomplices robbed a store, and one of the three men shot and killed a woman during the robbery. The jury found Ervin guilty of burglary, robbery and first degree murder and found true two felony-murder special circumstance allegations. (*Id.* at p. 94.) The jury found that Ervin personally used a gun during the burglary and robbery but *not* during the murder. (*Ibid.*)

13

In ruling on Ervin's section 1172.6 petition, the trial court found that the jury's true finding on the special circumstance allegations precluded resentencing relief as a matter of law because the jury necessarily found he was the actual killer or participated in the burglary and robbery with intent to kill. (*Ervin, supra,* 72 Cal.App.5th at p. 103.) The Court of Appeal disagreed, finding that under the unique circumstances before it, the trial court erred in denying the petition based solely on the special circumstance findings. The court noted that the prosecution pursued two theories of first-degree murder liability: premeditated and deliberate murder, and felony murder. However, despite the prosecution's theory of the case that Ervin was the actual killer, the jury did not find he used a gun in the commission of the murder. Therefore, the jury "potentially found Ervin guilty of murder as an aider and abettor under" the now invalid felony-murder rule. (*Id.* at p. 104.)

The Court of Appeal then found that the special circumstance findings did not cure the problem. The special-circumstance instructions contained this ambiguous, conditional language: " '[If you find beyond a reasonable doubt that the defendant was [either the actual killer or an aider or abettor, but you are unable to decide which], then you must also find beyond a reasonable doubt that the defendant intended *either to kill a human being or to aid another in the killing of a human being* in order to find the special circumstance to be true.]' " (*Ervin, supra,* 72 Cal.App.5th at p. 107.) This conditional wording allowed the jury to find that Ervin aided and abetted killing a person *without* the intent to kill. (*Id.* at p. 108.) The prosecutor in closing argument compounded the instructional problem by telling the jury multiple times it could find the special

14

circumstance true by finding merely that Ervin participated in a robbery during which a person was killed, without any mens rea finding. (*Id.* at pp. 109–110.)

Here, however, the special circumstance instruction, CALJIC No. 8.80.1, did not contain the problematic, conditional language given to Ervin's jury. It instead unambiguously instructed that an aider and abettor had to have intent to kill. And, as we have said, the prosecutor did not conflate the special circumstance allegation with the former felony-murder rule. That is, he did not tell the jury it could find the special circumstance allegation true if Roberts was an aider and abettor and lacked intent to kill.

Moreover, the verdicts here were consistent, unlike in *Ervin*, where the jury found Ervin guilty of burglary, robbery, and murder and further found he personally used a firearm during the burglary and robbery but *not* the murder, contrary to the prosecutor's theory that Ervin was the actual killer. (*Ervin*, *supra*, 72 Cal.App.5th at p. 103.) Roberts's jury found him guilty of first degree murder and of second degree robbery, found that he personally used a firearm during both crimes, and found true the special circumstance allegation—all of which accorded with the prosecutor's theories of liability at trial.[9]

---

[9]     *Ervin* also found the special circumstances instruction problematic because felony murder now requires an aider and abettor to assist "the *actual killer* in the commission of" first degree murder. (§ 189, subd. (e)(2), italics added; *Ervin*, *supra*, 72 Cal.App.5th at p. 108.) The instruction given to Ervin's jury, as the one here, required the jury to find he aided and abetted "*any actor* in the commission" of first degree murder. (*Ervin*, at p. 106.) Roberts does not address this issue, and therefore it is not before us on appeal, as we have no obligation to make

15

## DISPOSITION

The order denying Antonio Roberts's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.

---

arguments for litigants.  (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153; see *Public Employment Relations Bd. v. Bellflower Unified School Dist.* (2018) 29 Cal.App.5th 927, 939 [" ' "absence of cogent legal argument or citation to authority allows this court to treat the contention as waived" ' "].)